Filed 11/21/13  P. v. Encallado CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038459 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS102676A) |
| v. | |
| NOAH RYAN ENCALLADO, | |
| Defendant and Appellant. | |

A jury found Noah Encallado (appellant) guilty of three counts of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, counts one and three, victim Jane II, count eleven, victim Jane I),[1] one count of kidnapping (§ 207, count two, victim Jane II),[2] four counts of making criminal threats (§ 422, count four, victim Jane II, counts seven, eight, 10 and 12, victim Jane I) one count of evading an officer (Veh. Code, § 2800.2, count five), one count of possession of a controlled substance (Health & Saf. Code 11377, count, six), and one count of possession of a firearm by a felon (former §12021, subd. (a), repealed by Stats.2010, ch. 711, § 4, operative Jan. 1, 2012, count 13).  In addition, the jury found appellant not guilty of one count of inflicting corporal injury on a cohabitant (count nine, victim Jane I), but guilty of the lesser included offense of battery

---

[1]    We refer to the victims in this case as Jane I and Jane II to protect their anonymity.

[2]    All unspecified section references are to the Penal Code.

on a cohabitant (§ 243, subd. (e)), and not guilty of possession of ammunition by a prohibited person (former § 12316, subd. (b)(1), count 14). As to counts seven through 13, the jury found true an on bail enhancement (former § 12022.1, repealed by Stats.2010, ch. 711, § 4, operative Jan. 1, 2012).

Subsequently, the court found true the allegations that appellant had suffered two prior strike convictions—one for arson and one for making criminal threats. (§ 1170.12, subd. (c)(2).)

After the court denied in part appellant's *Romero* motion,[3] the court imposed consecutive three strikes terms of 25 years to life on counts one, two, five, seven, eight, 10 and 12, concurrent three strikes terms of 25 years to life on counts three, four, 11 and 13. The court granted the *Romero* motion as to count six. Accordingly, the court imposed a concurrent two year term on count six. The court imposed a term of 365 days on count nine and two years for the on bail enhancement. Appellant's total un-stayed indeterminate term amounts to 175 years to life.

Appellant filed a timely notice of appeal. On appeal, appellant challenges the admission of evidence that the court admitted pursuant to Evidence Code section 1109; argues that the court abused its discretion in denying his *Romero* motion, and contends that his sentence of 177 years to life amounts to cruel and/or unusual punishment. For reasons that follow we affirm the judgment.

*Testimony Adduced at Trial*

We set forth the evidence adduced at trial in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

*Jane II's Relationship with Appellant*

Jane II testified that she met appellant in July 2007 at the Salinas rodeo after which they started dating. In September they went to Reno together; one evening she fell

---

[3] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

asleep and when she awoke the next day, her car and appellant were gone. Appellant did not telephone her until she was on a bus returning to the Bay Area. Later she found out that appellant spent over $1000 on her credit card.

Jane II tried to break off the relationship with appellant, but he apologized and said that he would not do it again. When appellant tried to borrow her car, she refused and appellant became angry and pushed her so that she fell to the floor and her face smashed into the tile. This happened more than once.

Jane II testified that one night when appellant wanted to take her car he got angry and hit her on the legs with a hanger; another time he threw a cellular telephone at her after she questioned appellant about "communicating with other women."

Appellant would hit Jane II on the left side of the arm, which caused bruising. Whenever he would hit her it was always on the left side of the arm; he did this four or five times. At one point, appellant became "paranoid" and installed a security system so that he could see people coming in and out of the house.

On three occasions in December, appellant told Jane II to go into the bedroom and take off her clothes. Appellant examined her internally to see if she had had sex with anyone. Jane II did not tell anyone about what was happening because appellant threatened to rape Jane II's daughter and kill her son. Jane II described another incident in which appellant was pacing the floor with a tool larger than, but similar to a hatchet; he threatened to hit her with it.

Jane II described an incident in which appellant became very angry at her and kicked the left side of her leg. During this incident, Jane II called appellant's grandparents. Appellant's grandfather arrived and was able to calm down appellant. At this point, Jane II tried to leave but appellant became angry and threw a dresser across the room. Appellant grabbed her by the hair; appellant's grandparents were able to get her out of the house and drive her away.

3

Later, appellant found Jane II and after appellant apologized they went home together. Appellant insisted that Jane II take a "drug test," Jane said that she did not take drugs so there was no need to take a drug test. Appellant went to the kitchen and took out a butcher's knife; he told her to go to the bathroom where she had to urinate in a cup while appellant watched with the knife in his hand. Appellant examined the sample and stated that he could see she was taking drugs.

*Evidence as to Counts One through Four*

Jane II described her relationship with appellant in January 2008 as "becoming very volatile."

On January 9, 2008, Jane II had turned off her telephone line after appellant had taken her car again. Appellant returned and punched her on the side of her arm, shoved her to the floor and kicked the left side of her thigh, which left her with bruises on the side of her leg. The next time she saw appellant, Jane II was sitting at her desk. Appellant came straight up to Jane, slapped her "upside the head" and knocked her to the floor. When Jane II got up, appellant threw a pen at her and it stuck in her head.

Appellant told Jane II to change her clothes; he said " 'You're coming with me.' " Jane II told appellant she did not want to go, she just wanted her car. Appellant grabbed Jane II and they started walking to her car. Appellant ordered Jane to get in and he drove onto Highway 101 to a friend's apartment. When they arrived, Jane II told appellant that she did not want to go in; appellant told her she was coming in. Jane II went with appellant because she wanted to get her car back. Appellant told Jane II to sit on the coach. Other people arrived at the house and they began to play hacky sack; they moved the sofa so that it was blocking the door and they began to smoke methamphetamine. Jane said that she wanted to go home, but appellant refused to give the keys to her car to her as well as her cellular telephone; he told her to stay and sit.

At one point, Jane II went into the bedroom that was in the apartment. Appellant walked in and went into the bathroom where Jane II saw him get a toothbrush and clean

4

his teeth. Jane thought that this meant that appellant was seeing the girl that owned the apartment they were in. She confronted appellant. Appellant laughed, came over to where Jane II was sitting, put his arm around her and then punched her in the side of the head. Jane II got very angry and so did appellant; Jane II tried to get up to leave, but appellant pushed her and told her that she needed to stay there. Later, appellant left, but kept Jane II's cellular telephone and car keys and told her if she left he would come and find her; Jane II stayed because she was scared.

When appellant returned, he and the others smoked more methamphetamine and moved the coach in front of the door again. Appellant told everyone, " 'This way I can keep her in here.' " They left the apartment at approximately 3:30 a.m. Jane II walked down the stairs first. Appellant grabbed her in the back of the head by her hair and said, " 'You need to come with me. Because you're not running.' " Appellant forced Jane II into the car; when she started to resist appellant pulled harder.

In the car, appellant hit Jane II in the side of her head so hard that her head hit the side of the car. Jane II became angry and hit appellant. Appellant grabbed the back of her head and slammed her face down into the seat and began punching the back of her head. Appellant told Jane II he was going to take her somewhere and make "$250 off [her] by having somebody have sex with [her]." When Jane II told appellant that was not going to happen, he responded by hitting her in the head, grabbing her by the mouth so hard that she began to black out. At one point, Jane II tried to get out of the car, appellant told her that he would hunt her down and slit her throat.

When appellant stopped the car at a gas station, he told Jane II that if she ran he would shoot her in the back. However, Jane II ran across the street to an Arco Station and told a person to call the police. Jane spoke to the 911 dispatcher and a recording of

5

the conversation was played to the jury.[4]  An officer arrived and Jane was taken to the hospital in an ambulance.

Salinas Police Officer Kimberley Butz[5] testified that she responded to Jane II's 911 call.  She described Jane II as crying and shaking; Jane II was so upset that she was unable to answer many of the questions that Officer Butz put to her.  Officer Butz stated that after Jane II was taken to hospital, Jane II told her that appellant injured her over the course of the night; Jane II said that when she and appellant left an apartment, appellant held Jane II by the hair because he did not want her to run away and he struck her repeatedly, pushed her head down and demanded to know the name of the man with whom she was cheating.  Jane II told Officer Butz that appellant had kicked her and pushed her earlier in the week.  Officer Butz detected a slight odor of alcohol on Jane II, but she did not appear to be under the influence of alcohol.

A staff nurse at the Natividad Medical Center testified that Jane II told her she was slapped, punched and choked at home.  Jane II had a black eye, a laceration above her left eye, scratches on her cheek, neck and both arms as well as reddened areas on her left knee, right thigh and back.  Hospital records did not indicate that Jane II had been drinking.

On January 14, 2008, Jane II went to the house belonging to appellant's grandmother to retrieve some of her belongings; appellant was there.  Appellant came outside, got into Jane II's car and would not leave.  Jane II drove to the hospital to deal with some paper work.  When she came back to her car appellant was in the driver's seat.

Appellant drove Jane II's car.  In response to Jane II's suggestion that he turn himself in to the police, appellant said he was not ready.  Jane II saw a police car behind

---

[4]     During the 911 telephone call, Jane II said that her boyfriend was beating her and threatening to kill her.  Jane II told the dispatcher that appellant had beaten her on her face and that he had smoked crack.

[5]     Kimberley Butz was retired from the Salinas Police Department at the time of trial.  However, for ease of reading we will refer to her as Officer Butz.

them. When the police officer in the car turned on the lights, appellant drove into a side street. Before the officer could get out of the car, appellant drove off. Appellant drove through stop signs and almost hit a motorcyclist. Jane II wanted appellant to stop, but he said he wanted to go to his grandmother's house. Appellant was driving at speeds of 50 m.p.h. or faster. Eventually, appellant pulled over and jumped out of the car.

Officer Patrick Haney testified that on January 14, 2008, he was on patrol when he saw a vehicle that matched the description of a vehicle in a suspected domestic violence case. Officer Haney activated his lights and siren. As he did so, the suspect vehicle made a right turn and then another right turn and stopped. Officer Haney opened his driver's side door, but the suspect vehicle drove away.

Officer Haney saw the vehicle go through an intersection without stopping at the stop sign. Again, Officer Haney activated his lights and siren. During a chase, the vehicle he was pursuing was going at speeds of 50 or 55 m.p.h. in a 25 m.p.h. zone. The vehicle failed to stop at a stop sign. Briefly, Officer Haney lost sight of the vehicle, but then saw the tail end of the vehicle as it made a right turn without stopping at a stop sign. The car came to a stop and the driver got out of the car and fled.

Officers located appellant hiding underneath a nearby vehicle. Near appellant's location, the officers located a pill bottle with a scale. Inside the pill bottle was a crystalline substance. Having seen the substance "dozens" of times before, Officer Haney believed that the substance was methamphetamine. Officer Haney took appellant into custody.

After appellant was arrested, he admitted to Officer Haney that he saw the red lights on the police car and heard the siren; he said he fled because he was scared. Appellant told Officer Haney that he drove through six or seven stop signs; he admitted ownership of the pill bottle the officers found. Appellant said that he thought what was in the paper bindle in the pill bottle was "dope."

7

Laura Walker, a senior criminalist at the Department of Justice, examined the pill bottle that had been located close to where appellant was arrested. She determined that it contained a quantity of methamphetamine; the net weight of the sample was .15 grams— a usable amount.

After appellant was arrested, Jane II's car was impounded. Since she could not pay the impound fees, the car was sold. When appellant was in jail, he called Jane II and told her he expected her to stay by the telephone and to find a way to bail him out. At this time, Jane II was living with appellant's grandparents because she had no job and no money. When appellant would telephone Jane II, appellant would tell Jane II that it was her fault that he was in jail.[6]

*Evidence as to Counts Five through Fourteen*

Jane I testified that she met appellant in October 2010. They lived together for a while in her car, at the house of appellant's grandmother and in hotels. During the time they were together, appellant told her that he would kill her by putting a pillowcase over her head if she was conspiring against him. Jane I was intimidated by appellant because he was physically violent and verbally abusive.

On October 31, 2010, Jane I tried to leave appellant and move into her sister's house. However, she returned to appellant because Jane I's sister told her that if she wanted to stay with her Jane I would have to stop any involvement with appellant; at that time Jane I was not prepared to do that.

During the weekend of November 19-20, 2010, appellant and Jane I went to Pismo Beach to visit appellant's sister Regina. While they were there, around two or three

---

[6]     Jane II admitted that she told a very different story about what had happened when she testified at appellant's preliminary hearing. However, she explained that she was very frightened at that time because appellant had called her, threatened her, and told her that she had to say she made up everything. At trial, Jane II testified that the story she made up that her injuries were inflicted by a horse was not true; it was appellant who inflicted the injuries.

8

o'clock in the morning, they were on the beach when appellant grabbed Jane I and Regina by the arms and pulled them toward the ocean; appellant threatened to drown them if they were conspiring against him. Jane I had bruises on her arms and the sleeve of her coat was torn off by appellant.

Jane I ran back to her SUV, but realized that she did not have her keys so she waited for appellant and his sister to return. They got into the SUV and went to a different location. At some point, Jane I asked for her telephone since appellant had borrowed it. Appellant said that he did not know where it was. Later, Jane I saw the telephone in the vehicle; Jane I tried to use the telephone but the SIM card or battery was missing. Jane saw that the telephone had SOS on it so she pressed the button and started to call the police, but hung up. Appellant became very upset and grabbed the telephone and threw it. Jane I and appellant stayed in Pismo Beach for approximately two days. Jane I admitted that they used methamphetamine together along with appellant's sister.

During the course of their relationship, appellant would not let Jane I drive her SUV. On the way back from Pismo Beach, Jane I's SUV started to have problems. Jane I testified that appellant was "yelling" at her about conspiring against him by doing something to the vehicle. They stopped at a gas station where they spent the night in the SUV. The next morning someone appellant knew from the past came along and was able to get the car started. Appellant asked Jane I if she knew the person; when Jane I said she did not, appellant told her she was lying and that he was going to kill her if he found out she had anything to do with the person being there.

Jane I had to go to use the bathroom. Appellant perceived that she had taken too long. When he asked Jane I why she spent so long in the bathroom, Jane I explained that she had started her period. Appellant followed her into the bathroom, accused her of sleeping with other men, and dumped out the garbage can looking for evidence that Jane I had slept with another man the night before.

9

Eventually, they drove back to the house belonging to appellant's grandmother. Appellant went inside the house while Jane I stayed in the SUV. Jane I swallowed a bottle of pills that she had in her glove compartment. She explained that she did so because she felt worthless and helpless and had nowhere to go; she believed appellant was going to kill her.

Jane I was hospitalized for approximately one week. Appellant was there with her "every minute of every day" when she was awake. After she left the hospital, she went with appellant to a hotel. She tried to see her children; at the time they were living with their father because she was in an abusive relationship and was taking drugs. She was having supervised visitation through the court system. On the Tuesday after she got out of the hospital she had a supervised visit with the children. Usually, on these visits appellant insisted on accompanying her, but on November 30, she went alone. Jane I was away from appellant for approximately an hour and 30 minutes. Appellant sent a text message to Jane I's ex-husband to find out when Jane I would be heading home.

When Jane I got back to the hotel room she shared with appellant, he accused her of sleeping with the father of her children. Appellant grabbed Jane I by the face and throat and threw her on the bed. Appellant attempted to rip off her clothes so he could find evidence of sexual activity. During the struggle, appellant hit Jane I with his fist on her mouth, which caused an injury. Appellant grabbed Jane I's belongings and threw them outside the door; Jane I gathered them up and started to leave. Appellant started to cry and begged her not to leave. Jane I decided to stay because she had nowhere else to go.

Afterwards, appellant continued to threaten Jane I by saying that if she was conspiring against him or sleeping with anyone else he would kill her by putting a pillowcase over her head.

On December 2, a man in the room next to Jane I and appellant's room asked if they wanted to buy marijuana. When the man left, appellant accused Jane I of looking at

10

the man in a sexual way. Appellant told Jane that if it was true, he was going to kill both of them; she believed him because he had been physically abusive to her.

Jim Fisher, a family relationship investigator for the Superior Court, testified that he met with Jane I on December 3. He described her as being very quiet and very fearful. He saw a swelling on her lip. Mr. Fisher took Jane I and her ex-husband into his office as Jane I's appearance bothered him. Jane I told him that after she got out of the hospital appellant struck her; she pointed to her lip. Jane I told Mr. Fisher she did not want to be with appellant, who was waiting outside the office, so he consulted with one of the judges at the court and he was advised to call the police.

Salinas Police Officer Justin Salinas interviewed Jane I on December 3, 2010. He testified that she was shaken and fearful. He interviewed her the next day and noticed two "semi-vertical horizontal scabs" on her upper right lip. On the inside of her upper lip there were white plaque type markings approximately one inch in length that were directly behind the scab on the outside of her lip. Officer Salinas thought the injuries were due to blunt force trauma and were approximately five to seven days old. At trial he identified photographs of Jane I's injuries; the photographs were shown to the jury.

Jane I testified that appellant had guns in a duffel bag in her SUV; he brought them from his grandmother's garage and was going to sell them. Jane I told appellant she did not want them in her SUV, but she could not remember how appellant responded.

Jane I's sister testified that in October 2010, she received text messages from her sister where she said that she was afraid of appellant. When Jane I stayed with her, she searched Jane I's SUV and found approximately 10 bullets in a shoe box; she gave them to her ex-husband so that he could dispose of them.

The parties stipulated that appellant had a prior conviction for a felony and was released on bail from June 13, 2010 to December 4, 2010.

11

Pursuant to Evidence Code section 1109,[7] Jane III testified that she had a relationship with appellant for less than one year and that he was abusive to her. On one occasion, he barricaded her in his room and strip searched her looking for a "bug"; he conducted a cavity search on her. When she tried to leave the room he pushed her down and would not allow her to leave. They were both using methamphetamine at the time. Jane III was afraid of appellant.

Jane III tried to end the relationship with appellant, but he would not let her; he would go to her worksite and tell her that he was sorry and that he wanted her to be there for him emotionally. Jane III moved into her family's home when she found out she was pregnant; eventually, she miscarried. Jane III tried to end the relationship and told appellant not to contact her anymore, but appellant had an aunt "three way" call her and appellant would leave abusive messages on her message machine. Jane III left the family home.

Eventually, because she was afraid of appellant, Jane III told him to get his things from her residence. Jane III was in Reno, Nevada at this time. Appellant was supposed to report to Salinas and when he came to her residence she encouraged him to return there. Appellant became agitated and Jane III encouraged him to leave, but appellant accused her of waiting for another man to come over. When she told him that was not true, appellant tore apart her bed looking for evidence that she had been cheating on him; appellant looked in her closet to see if there was a man hiding there. Appellant went through the photographs in her telephone; when she asked for her telephone back they struggled and the telephone broke in half. Jane III ran down the stairs and tried to call

---

7   "Evidence Code section 1109 allows the introduction of evidence of [a] defendant's commission of prior acts of domestic violence in a criminal action charging [the] defendant with an offense involving domestic violence." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.)

12

911 on a cordless telephone she had there. Appellant stopped her and threw the telephone against the wall and the batteries came out.

Eventually, Jane III ran for the front door and screamed for help. Appellant grabbed her and threw her against the wall. He covered her mouth and nose with his hand; she could not breathe. Appellant picked up Jane III by her waist and told her to get upstairs. When she would not go, appellant picked up Jane III and tried to force her upstairs. They fought on the stairs, but Jane III could not get away. Even though she fell down the stairs appellant grabbed her by the hair and throat and carried her back upstairs. Ultimately, appellant locked her in her bedroom, and threw her on the bed. Appellant became more and more angry and poked her in the eye with the telephone antenna.

Jane III still had her cellular telephone in her hand and she noticed that the light was still on so she pushed the number one to speed dial a friend; she talked hoping that someone would hear her. Then, she dropped the telephone. Jane III ran for the bedroom door to try to unlock it. Appellant stopped her so she ran for the sliding glass door and tried to run through it but she could not. Appellant started tying belts together as a noose and tested the loop to see if it would hold. Jane III was very afraid and began to black out. The next thing she remembers was being in the corner of her room with her friend and the police. Appellant was not there.

The next day, Jane III moved out of her residence and filed for a restraining order against appellant. Appellant telephoned her and asked her if she had called the police. Jane III told him she did not call the police, but someone had called them. Appellant told her that she had ruined his life and that she was now his number one enemy and was going to pay; he was going to find her. Jane III changed her telephone number and went into hiding. A protection order was served on appellant and she never heard from him again. In the past appellant had joked about a restraining order just being a piece of paper.

*Discussion*

13

*I.      Evidence Code Section 352 Challenge to the Testimony of Jane III.*

Before Jane I and Jane II testified, Jane III testified as noted *ante*.  Before trial, appellant moved to exclude evidence of any incidents of domestic violence against anyone other than Jane I and Jane II.

The prosecution's offer of proof as to Jane III was as follows:

"On June 6, 2005 (Sparks Case No. 05-7209), the defendant was released from Nevada prison and paroled to Salinas.  The defendant came to [Jane III's] home instead of going to Salinas.  She tried to persuade him to obey the order to report to Salinas but he accused her of cheating on him, searched her cell phone for proof and later broke her cell phone.  When she tried to use her home phone he grabbed it away.  She tried to leave the house but he dragged her up the stairs, took her to the bedroom where he locked the door and pushed her on the bed.  She asked him to leave.  He told her if she called the police he would find her and that a restraining order meant shit, that it was just a piece of paper. He poked her with the antenna from the home phone.  He took off his belt and tied it in a noose with another belt he took from her closet.  He tested it with his foot.  Jane [III] dialed her friend's number and unbeknownst to [her] left the line open which generated a voice mail [on which he] could hear Jane [III] pleading with the defendant not to hurt her. Shortly after the defendant tied the belts together, Jane [III]'s friend came to the home and told the defendant to get out which he did.  Both Jane [III] and her friend obtained Orders of Protection to prevent further contact.  However, the defendant called Jane [III] and asked her if she had called the police.  He told her he had ruined her, she was his number one enemy that she could not hide, he would find her and she would pay.  [¶]  Jane [III] applied for and was granted a Temporary Order For Protection Against Domestic Violence on 7/25/07 and on August 30, 2007 received an Extended Order For Protection Against Domestic Violence.  Jane [III's] friend received a Temporary Order For Protection Against Stalking, Aggravated Stalking or Harassment on July 24, 2007 and an Extended Order on August 21, 2007 until August 21, 2008."

14

The court ruled that the prosecutor would not be allowed to elicit evidence from all the women who allegedly had abusive relationships with appellant, but that the prosecutor could present the proffered evidence that had occurred in 2005 involving Jane III.[8] The court balanced the probative value of the evidence against the prejudice to appellant. Specifically, with regard to the incident involving Jane III, the court found that the events were similar, were within the 10 year time limit, and were not cumulative. Further, the events were probative because the events demonstrated "defendant's power and control over victims and domestic violence victims." The court found that it would not involve an undue consumption of time. As to prejudice, the court found that the evidence would not "uniquely tend to evoke an emotional bias against the defendant any more so than the 1109 evidence that's coming in because he's got two Jane Does that are being charged in this matter. And it is probative. It is evidence that provides the jury with a clear picture of the defendant's relationships with other women." Accordingly, as noted Jane III was allowed to testify.

Appellant argues that the court abused its discretion in admitting the Evidence Code section 1109 evidence and thereby violated his federal and state constitutional rights. Respectfully, we disagree.

As noted, "[e]vidence Code section 1109 allows the introduction of evidence of [a] defendant's commission of prior acts of domestic violence in a criminal action charging [the] defendant with an offense involving domestic violence." (*People v. Poplar*, *supra,* 70 Cal.App.4th at p. 1138.) Specifically, subdivision (a)(1) of Evidence Code section 1109 provides in part (with exceptions not applicable here): "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of

---

8     In addition to the incidents involving Jane III, the prosecutor's trial brief showed two more victims of appellant's domestic violence; the first victim appears to have suffered abuse in 1994, the second victim appears to have suffered abuse starting in 1996 and ending in 1999.

15

the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

Evidence Code section 1109 creates an exception to the general rule codified in Evidence Code section 1101, subdivision (a) that precludes admission of uncharged misconduct to show the defendant had a propensity to commit crimes. (Evid. Code, § 1109, subd. (a)(1); see also *People v. Johnson* (2000) 77 Cal.App.4th 410, 417.)

"The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion. [Citations.]" (*People v. Poplar, supra,* 70 Cal.App.4th at p.1138.)

Under Evidence Code section 352, evidence is properly excluded if its probative value is " 'substantially outweigh[ed]' " by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Appellant compares the situation here to that in *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*); he argues that just as in *Harris*, Jane III's testimony was more egregious than the evidence of the offenses charged in the instant case and was remote,

16

inflammatory, nearly irrelevant, likely to confuse the jury and distract the jury from consideration of the charged offenses.

Harris was a case in which the defendant, a mental health nurse who worked at a mental health treatment center, was convicted of several sex offenses; he had been accused of preying on women who were vulnerable due to their mental health condition. (*Harris*, *supra*, 60 Cal.App.4th at pp. 730-731.) The Court of Appeal found an abuse of discretion in admitting evidence under Evidence Code section 1108. However, the facts in *Harris* were entirely different from those here. In *Harris*, the prior offense was forcible and the evidence of it was "inflammatory *in the extreme.*" (*Id.* at p. 738.)[9] The charged sexual offenses were, by contrast, not forcible but involved breaches of trust. Thus, the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury." (*Ibid.*) Moreover, "[t]he facts of the prior conduct were redacted to a point that the jury must have come away with a misleading impression of what happened . . . ." (*Id.* at p. 733.) The prior offense occurred 23 years before the charged offenses, a factor the Court of Appeal found weighed in favor of exclusion. (*Id.* at p. 739.) The circumstances found in *Harris* do not exist here. Nothing in *Harris* compels the conclusion that the court abused its discretion in admitting the evidence here.

Simply put, Jane III's testimony describing appellant's prior acts of domestic violence was no more inflammatory than Jane I and II's testimony. There was no probability of confusing the jury with the evidence of prior acts of domestic violence. The incident Jane III described was relatively recent in relation to the acts involving Jane

---

[9]     According to the *Harris* court, "the evidence of the 1972 incident described a viciously beaten and bloody victim who as far as the jury knew was a stranger to the defendant. The defendant's role in the attack and his subsequent conviction for burglary, while apparently violent and sexual, is unexplained. The jury is simply told that defendant was convicted of burglary with the infliction of great bodily injury." (*Harris*, *supra*, at p. 738.)

17

I and II—and the testimony required just 30 pages of trial transcript, including cross examination, redirect, recross and further redirect. The evidence was extremely probative, showing appellant's propensity for violence—aggressive, abusive and possessory conduct— against intimate partners in an effort to control their behavior. The prior incident of domestic violence was not the sort to evoke an emotional bias against appellant as was the prior incident in *Harris*. (See *Harris, supra,* 60 Cal.App.4th at pp. 737–741.)

Finally, the fact that the jury found appellant guilty of only the lesser offense of battery on count nine and not guilty on count 14 (possession of ammunition by a felon), actually bolsters the conclusion that the jury based its verdicts on the evidence presented at trial rather than being prejudiced against appellant by the prior domestic violence incident about which Jane III testified. Evidently, the jury carefully weighed the evidence and found some of it deficient.

## II.    Denial of Appellant's Romero Motion

As noted, after the court found appellant's prior convictions were strikes, appellant filed a motion to strike one of the two strikes—a prior conviction for arson. Defense counsel argued that the arson conviction involved the lowest form of arson because it involved burning gasoline on a portion of a driveway and a section of a wooden fence that ran along the side of the driveway. Counsel argued that the crime should have been charged as unlawfully causing a fire under section 452. Counsel alleged that appellant's conduct was influenced by abuse he witnessed and experienced as a child.

In opposition to the *Romero* motion, the prosecutor argued that a three strikes sentence was presumptively correct and that while the court had discretion to grant a motion to a strike a prior strike conviction that discretion was limited. The prosecutor pointed out that the factors the court had to consider pursuant to *People v. Williams* (1998) 17 Cal.4th 148, 162, did not warrant granting the motion.

18

The prosecutor 's version of the arson incident involved appellant, after having drunk 24 beers and having used crack and cocaine, leaving a voicemail message threatening to kill his former girlfriend—who was pregnant with his child—and then driving to her house at 3:30 a.m. There appellant entered her garage, deflated her tires and stole her purse, day planner and CDs. Appellant broke the windshield wipers on her car and stuffed rags in the vehicle's tailpipe. The prosecutor described what happened next: "The defendant then took a container of gasoline out of the garage and poured it onto the driveway and fence and lit them on fire. The owner of the house and all her children were in the home asleep during the fire. The defendant was aware that people were asleep in the house because he looked inside. However, the defendant did not express any remorse over his actions. The probation officer stated 'it is amazing to this officer that the defendant still cannot see that the fire that he set could not only have destroyed someone else's residence but human beings that were inside.' "

The prosecutor described appellant's criminal history and violations of probation stretching back to 1994. In 2002, appellant was incarcerated in a Nevada prison after a violation of probation.

The probation officer's report, which the court had before it at the *Romero* hearing, showed that appellant had prior convictions in Nevada for robbery in 1999, and attempted burglary in 2000 for which he received suspended state prison sentences. The probation officer considered appellant's performance on probation to be unsatisfactory—the report showed that appellant's probation had been revoked three times. The probation officer characterized appellant as a serial batterer who engaged in violence against multiple victims, which indicated he was a danger to society. Appellant's first conviction in 1994 was for misdemeanor battery/domestic violence.

As noted, the court granted the *Romero* motion as to only count six. The court discussed defense counsel's reasons for the striking the strike, but noted that the court's discretion was "not absolute." The court stated that it was required to "consider the

19

interest of society as well as the rights of the defendant and balance those." The court went on to say the considerations the court was required to look at included "the nature and circumstances of the present felonies, the nature and seriousness of the felonies" that appellant had committed in the past as well as particulars of appellant's background, character and his prospects for rehabilitation.

The court noted that the crimes did not result in great bodily injury, but did not consider that fact to require granting the motion. Specifically, the court stated, "However, I have to look beyond whether or not there were physical injuries here, because the other injuries, the threats of violence to obtain power over the victims, the use of truly inhumane and demeaning acts to create fear and create the lack of self worth and the sense of powerlessness in these victims created a mental injury that can't be quantified. You could tell just in watching these women testify—and I will not— although I don't consider Jane [III]'s testimony in the nature and circumstances in this offense, her description of the fear and powerlessness and lack of self worth were exactly the same as what you observed in Jane [I] and [II]. They are the types of injuries that a CAT scanner at an x-ray cannot view, but they are lasting injuries that these women will carry with them for the rest of their lives. So the injuries I do find to be significant in these cases, although they weren't injuries that were discernible so much by a medical team. [¶] And also the commonality of the selection of vulnerable victims in this matter cannot be overlooked by this Court. The defendant was finding women who he could use for all sorts of reasons. Use for monetary reasons. Use for drug reasons. Use to complete something in him that required him to have power over these women. So I do find that the nature and circumstances of the current offense are ones that would make . . . this case appropriate as a Three Strikes case."

The court looked at appellant's prior criminal history and concluded, "although I will [ac]knowledge that when you look at a 451 bare, it is less serious than most strikes. And I will [ac]knowledge that it was from 1996. However, the thing that makes this 451

20

different than most is that . . . it is a domestic violence crime, because it's similar conduct. It's a situation where the defendant is trying to instill fear and terror in one of the people that was an intimate partner. So the conduct is similar. The surrounding circumstances where he vandalizes a car, pours gasoline on the fence and sets it on fire is . . . similar in that it is instilling terror and fear, and it's also dangerous. There's danger here to multiple victims. I don't care whether he was there and watched the fire go out. Every one of us have heard about fires or seen or had the experience of a fire that went out reigniting and starting again and causing dramatic injury not only to property but also to people. So the seriousness and dangerousness of this particular 451 cannot be overlooked."

The court looked at appellant's background and noted that although he may have had a difficult childhood involving drugs and alcohol, in light of the fact that his other family members had "become positive supportive contributing members of their community," it was "not something that [appellant] couldn't have overcome."

The court felt that it could not overlook appellant's "continuous history of domestic violence." The court pointed out that appellant had "been with numerous women since 1994. And I don't know how many there have been, but there certainly have been numerous that have endured the defendant's same pattern of terrorizing conduct. And he's not someone that is so small that he needs to use terror or threats. It's something that he uses alongside with the physical violence that is above and beyond what we see in most of these cases. If this was something that was a childhood[,] a young man's way of dealing with women, it should have been something that he had out grown. Mr. Encallado has been given every opportunity by the Court to either out grow or be educated beyond this type of conduct or be penalized so that he knows that if he does it again he's going to go back to . . . custody. And he has chosen to ignore all those options. The criminal justice system has a variety of different things that it uses to try to encourage people to do the right thing. Some of it is education. Some of it is programs. You've had domestic violence programs. You've had drug programs. Some of it is

21

penalizing so that you realize jail is not that great a place, maybe you won't do it. Maybe you won't do it again. So that you realize how bad jail is. None of those seem to have worked. And the last thing we do is we incarcerate people just to keep them away from the public. That's our last ditch effort. And that's what we're left with here."

The court concluded that looking at all factors the court was required to consider, the court could not find this to be a situation where appellant "has shown any reason to do anything other than follow the legislative plan that has been provided for people who are continuing recidivists who continue to be violent and dangerous and terrorize people in our community." Accordingly, the court denied the request to strike appellant's prior strike convictions as to all charges except the Health and Safety Code violation (count six).

Appellant argues that the court decided his *Romero* request without giving meaningful consideration to his abusive childhood, his future prospects, and other factors such as the age of his prior strike convictions. Appellant contends that a ruling by the court in these circumstances must be considered an abuse of discretion. Respectfully, we disagree with appellant's characterization of what the court did in this case.

Under section 1385, subdivision (a), a "judge . . . may, either on his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." In *Romero, supra*, 13 Cal.4th 497, our Supreme Court held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, in furtherance of justice pursuant to section 1385, subdivision (a). (*Id*. at p. 504.) The *Romero* court held that a court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is reviewable for abuse of discretion. (*Ibid.*) In *People v. Carmony* (2004) 33 Cal.4th 367 (*Carmony*), the court held that a sentencing court's *refusal* to dismiss or strike a prior conviction allegation is also subject to review under the "deferential abuse of discretion standard." (*Id*. at p. 376.)

22

The court's discretion to strike a prior strike is limited; it is guided by "established stringent standards" designed to preserve the legislative intent behind the "Three Strikes law." (*Carmony, supra,* 33 Cal.4th at p. 377; § 1385, subd. (a).)  As the *Romero* court explained*,* "the Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero, supra,* 13 Cal.4th at p. 528.)  Thus, in determining whether to strike a prior strike conviction in the interests of justice the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at pp. 376–377.)

Appellant's reliance on *People v. Bishop* (1997) 56 Cal.App.4th 1245 (*Bishop*) to argue that there was an abuse of discretion here is misplaced.  There, the defendant was charged with petty theft with a prior theft-related conviction that had resulted in his incarceration (§ 666); the information alleged, inter alia, that he had sustained three prior

strike convictions. (*Id.* at pp. 1247–1248.) The trial court granted the defendant's motion to strike two of three prior strikes alleged in the information which it deemed "remote (17 to 20 years old)" (*id.* at p. 1248) and thereafter sentenced the defendant to a 12–year prison term. (*Id.* at pp. 1248–1249.) The appellate court rejected the People's claim that the court erred because it placed undue weight on mitigating factors and did not properly weigh factors in aggravation that supported the imposition of a three-strikes sentence. (*Id.* at p. 1250.) The *Bishop* court observed that the People's analysis was flawed because it "fail[ed] to accord the trial court the breadth of discretion that it has traditionally possessed under section 1385." (*Ibid.*) The *Bishop* court found no abuse of discretion; the court explained that while the trial court must consider that a defendant's qualification as a three-strikes offender is a factor in aggravation, "the nature and timing of a defendant's crimes may also operate as mitigation, such as in this case where the present crime is a petty theft and the prior violent offenses are remote." (*Id.* at p. 1251.)

*Bishop* is distinguishable, both procedurally and factually. The court there was concerned with whether the granting of a *Romero* motion constituted an abuse of discretion. Here, we consider whether the court abused its discretion in denying appellant's motion, thereby concluding that this case did *not* present "extraordinary" circumstances under which appellant, as " 'a career criminal[, should] be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record . . . .' " (*Carmony, supra,* 33 Cal.4th at p. 378.)

Second, *Bishop* predates *Williams, supra,* 17 Cal.4th 148. Consequently, it did not apply the appropriate standard: whether the defendant should be deemed to fall outside the scheme's spirit. Instead, the *Bishop* court indicated the nature of the present crime and the remoteness of the defendant's prior violent offenses operated to mitigate his Three Strikes sentence. However, the Three Strikes law provides: "The length of time between the prior serious and/or violent felony conviction and the current felony

24

conviction shall not affect the imposition of sentence." (§ 667, subd. (c)(3).) Thus, remoteness does not take a defendant outside the spirit of the very law that expressly rejects remoteness as a basis for avoiding it. Indeed, the Supreme Court in *Williams* found "not significant" the fact that 13 years passed between the defendant's prior serious and/or violent felony convictions and the current felony conviction, because the defendant did not refrain from criminal activity during that span of time. (*Williams, supra,* 17 Cal.4th at p. 163.)

Here, the court's comments indicate that it carefully balanced the relevant factors and reached an impartial decision in conformity with the spirit of the Three Strikes law. The court gave due consideration to appellant's abusive childhood, but found that factor did not outweigh the violent, obsessive, and abusive nature of his current felonies and prior felony convictions. The incidents of domestic violence in which appellant has been involved stretched over a period of some 15 years.

In sum, based on appellant's age (36), his unrelenting history of violence toward women with whom he is intimate, which has spanned just under half his life, his prior commitments to jail and prison, the failed attempts at probation, his failure to benefit from domestic violence programs, and the nature of the current felony offenses involving violence, a threat of violence and complete indifference to the risk of harm to an intimate partner—some of which were carried out while he was out on bail—the trial court did not abuse its discretion in denying the *Romero* motion. (See e.g., *People v. Williams, supra,* 17 Cal.4th at pp. 162–164; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 812–813 [the defendant has not led a legally blameless life since his prior convictions].)

We cannot say the court's ruling was irrational or arbitrary let alone so irrational or arbitrary no reasonable person could agree with it. There was no abuse of discretion.

III.   *Alleged Cruel and Unusual Punishment*

Finally, appellant seeks remand and resentencing on the ground that his sentence—177 years to life in prison—is cruel and unusual punishment in violation of the

Eighth Amendment and article I, section 17, of the California Constitution. As he did not raise this objection below, it is forfeited. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. Norman* (2003) 109 Cal.App.4th 221, 229.) Nevertheless, since appellant has raised a claim of ineffective assistance of counsel, briefly, we shall reach the merits under the relevant constitutional standards.

In support of much of his argument he relies on a concurring opinion by Justice Stanley Mosk, which expressed that justice's view that a "multicentury" sentence, "impossible for a human being to serve," violates the Eighth Amendment of the federal Constitution and article I, section 17 of the California Constitution. (*People v. Deloza* (1998) 18 Cal.4th 585, 600–601 (conc. opn. of Mosk, J.).) Nevertheless, this opinion lacks the agreement of a majority of the court; thus it has no value as precedent. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

On the other hand, the court in *People v. Sullivan* (2007) 151 Cal.App.4th 524, 572, held that the fact a defendant may not be able to serve the entirety of his or her sentence does not in itself make the punishment inappropriate. In practical effect a defendant is in the same position as one sentenced to life without possibility of parole— and the latter sentence has been held in appropriate cases not to violate the prohibition against cruel and unusual punishment under either the federal or California Constitution. (*Id.* at p. 572.)

The general rule is that a sentence violates the Eighth Amendment if it is "grossly disproportionate to the severity of the crime." (*Rummel v. Estelle* (1980) 445 U.S. 263, 271.) To make this determination a reviewing court examines the gravity of the offense and the harshness of the penalty. (*Solem v. Helm* (1983) 463 U.S. 277, 290–291.) In addition, a court may be guided by comparisons with sentences imposed in the same jurisdiction for other offenses, and with sentences imposed in other jurisdictions for the same offense. (*Id.* at pp. 291–292.)

Here appellant suffered three convictions for crimes involving violence against intimate partners, one conviction for kidnapping one of his victims, and four convictions for crimes involving the threat of violence to those same victims; his sentence is based not only on these convictions but also on his prior convictions for arson, which involved setting a fire at the home of an intimate partner, and making criminal threats—both convictions holding the potential for violence and representing appellant's recidivism. A sentence imposed in this manner under the three strikes law is not necessarily grossly disproportionate so as to violate the Eighth Amendment. (See *Ewing v. California* (2003) 538 U.S. 11, 30–31.) For his part, appellant does not appear to present one of those "rare cases" in which a threshold comparison of his crimes and his sentence is sufficient in itself to infer that the sentence is grossly disproportionate. (*Id.* at p. 30.) Appellant provides no argument or jurisdictional comparisons to persuade us otherwise, except to argue that his term far exceeds his life expectancy. As such we see no merit in his forfeited claim that his sentence violates the Eighth Amendment.

To succeed on a challenge under the cruel or unusual punishment provision of the California Constitution, a defendant must show that the punishment is so disproportionate that it "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) A reviewing court must examine the nature of the offense and/or the offender, *with particular regard to the degree of danger both present to society*; compare the challenged punishment to punishments for more serious crimes in the same jurisdiction; and compare such challenged penalty with the punishments prescribed for the same offense in other jurisdictions having a similar constitutional provision. (*Id.* at pp. 425–427.)

Appellant makes no showing on the second and third *Lynch* factors, which require the comparison of appellant's punishment with punishments in California for more serious crimes and the punishment imposed with punishments in other states. Again, when we look to the offender and his offenses, we see a serial batterer who has little

regard for his intimate partners; a batterer who uses violence, threats of violence, and intimidation to control his partners for the purpose of achieving absolute power and control over them. Although no victim was seriously permanently physically injured, the psychological damage appellant has inflicted on his victims is immeasurable.

In sum, we do not find appellant's punishment to be out of all proportion with the offenses and so disproportionate as to "shock[ ] the conscience and offend[ ] fundamental notions of human dignity." (*Lynch, supra,* 8 Cal.3d at p. 424.)

Finally, appellant asserts that if this court concludes that any of the relief he has requested cannot be granted because his counsel failed to preserve the issue for review, he did not receive the effective assistance of counsel. Since we have addressed all appellant's issues, even the one that was forfeited, it is not necessary to address his ineffective assistance of counsel argument.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.